**FINANCIAL INSTITUTIONS**

**FINANCIAL INSTITUTIONS – BANKS – MARYLAND LAW MAY NOT PROHIBIT ACQUISITION OF MARYLAND BANK AND ITS HOLDING COMPANY BY NEW JERSEY BANK HOLDING COMPANY AFTER MARYLAND BANK MERGES WITH FEDERAL SAVINGS BANK**

September 1, 1994

*The Honorable Margie H. Muller*
*Bank Commissioner*

You have requested our opinion whether a proposed acquisition of a Maryland bank would be prohibited by Maryland law. For the reasons stated below, we conclude that the transaction, as currently proposed, would not be prohibited.

**I**

**Background**

First Fidelity Bancorporation ("First Fidelity") is a bank holding company with its principal offices in Lawrenceville, New Jersey. Baltimore Bancorp is a Maryland bank holding company with one commercial banking subsidiary, the Bank of Baltimore (the "Bank"). Prior to its conversion to a commercial bank in 1984, the Bank was a State-chartered mutual savings bank.

First Fidelity wants to enter the Maryland banking market by acquiring the Bank, but a direct acquisition of the Bank or of Baltimore Bancorp would be prohibited under Maryland's reciprocal interstate banking law, Title 5, Subtitle 10 of the Financial Institutions ("FI") Article, Maryland Code, which was enacted into law in 1985. Subtitle 10 provides that only bank holding companies having 80% of their assets located within a defined geographic region may acquire banks in Maryland. First Fidelity, based in New Jersey, is not within Maryland's "region." *See* FI §5-1001(o)(2).

First Fidelity proposes to avoid this obstacle to the acquisition by having the Bank, prior to the acquisition, merge with a newly-chartered federal savings bank ("New FSB"). New FSB would be the survivor. At that point, the Bank would cease to be a bank, and Baltimore Bancorp will cease to be a bank holding company. First Fidelity would then acquire Baltimore Bancorp along with its New FSB subsidiary.

This transaction raises two issues under Maryland banking laws. The first is whether there is any obstacle to the conversion of the Bank into New FSB by merger. The second is whether First Fidelity's acquisition of Baltimore Bancorp after the conversion of the Bank is permitted.[1]

So far as federal law is concerned, the type of acquisition contemplated by First Fidelity is permitted under the Bank Holding Company Act of 1956, 12 U.S.C. §1841 *et seq.* Section 4(i)(l) of that act expressly permits a bank holding company to acquire a "savings association." Furthermore, since the enactment of the Federal Deposit Insurance Corporation Improvement Act of 1991, both banks and thrifts have been able to acquire or merge with each other, subject to approval by appropriate federal banking regulators.[2]

---

[1] The operations and activities of federally chartered savings institutions, including savings banks, are governed exclusively by federal law "from ... cradle to ... corporate grave." *Fidelity Federal Savings & Loan Ass'n v. De la Questa*, 458 U.S. 141, 145 (1982) (internal quotation marks and citation omitted).

[2] Sections 501 and 502 of the FDIC Improvement Act amended Section 5(d)(3) of the Federal Deposit Insurance Act, 12 U.S.C. §1815(d)(3), and Section 10(s) of the Home Owners' Loan Act, 12 U.S.C. §1467a(s), respectively, to permit any FDIC-insured depository institution to merge with any other. Prior to the FDIC Improvement Act, conversions between banks and savings institutions were permitted only if one of the institutions was "in default or in danger of default." 12 U.S.C. §1815(d)(2)(B).

## II

### Merger of Bank into New FSB

The Financial Institutions Article authorizes a variety of corporate combinations. FI §§3-701 *et seq*. provide for the merger, consolidation, or transfer of assets between Maryland-chartered banks, and between a Maryland-chartered bank and a national bank. Also, FI §3-801 authorizes conversion from a national bank to a Maryland-chartered bank.[3]   FI §3-802 authorizes the reverse conversion.   Finally, FI §§9-631 through 9-639 provide for conversion by a State-chartered capital stock savings and loan association into a State-chartered commercial bank.

By contrast, there is no specific provision for a Maryland-chartered bank to convert to, or merge into, a federal savings institution. The question, then, is whether this omission means that such a transaction is prohibited. In our view, the statutory silence should not be construed to have a prohibitory effect.

The Maryland law should be considered against the background of changes in federal law. Prior to the enactment in 1991 of the FDIC Improvement Act, federal law had no mechanism for insured thrift institutions and commercial banks to merge or consolidate, unless one of the institutions was failing to meet regulatory capital requirements (an "emergency" or "assisted" transaction).[4]  However, the 1991 act authorized, for the first time, any FDIC-insured institution to acquire, or be acquired by, any other insured institution. Although the wording and codification of the pertinent amendments vary slightly among the several acts amended by the FDIC Improvement Act, the substance of all of them is fairly conveyed by 12 U.S.C. §12-1467a(s)(1), a portion of the Home Owners' Loan Act:  "Subject to sections 5(d)(3) and 18(c) of the Federal Deposit Insurance Act [12 U.S.C. §§ 1815(d)(3) and 1828(c)] and all other applicable laws, any Federal savings

---

[3] Conversion is a process that does not involve any combination of more than one existing entity, but rather contemplates a single institution changing its essential character by amending its charter and adjusting its purpose and activities.

[4] *See* note 2 above.

association may acquire or be acquired by any insured depository institution."

The congressional purpose in enacting the FDIC Improvement Act's amendments authorizing combinations of healthy banks and thrifts is quite clear in the legislative history. The House Banking, Finance and Urban Affairs Committee report on the bill explains:

> The Committee adopted an amendment to create incentives to inject greater amounts of private sector capital into the thrift and banking industries in order to avoid the use of taxpayer funds. Specifically, the Committee voted to allow any ... insured depository institutions to combine with each other. This amendment was adopted because the Committee is concerned about the growing cost of thrift and bank resolutions and the increased cost to the taxpayers of these resolutions.

H.R. Rep. No. 102-330, 102d Cong., 1st Sess. 113 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1901, 1926. "In particular," the Committee pointed out, "currently healthy banks and thrifts which may experience financial difficulties in the future should be allowed to combine with other institutions in order to avoid being placed into conservatorship and necessitating the expenditures of taxpayer funds." *Id*.

Particularly in light of this congressional judgment, we discern no State public policy interest to be served by reading the absence of express authorization in State law for this type of merger as a prohibition. To the contrary, the lack of any statutory provision for combinations between thrifts and banks is very likely attributable to the developments in the laws governing financial institutions that resulted from Maryland's well-documented savings and loan crisis of the mid-to-late 1980's.

FI §9-918, enacted as a part of Chapter 149 of the Laws of Maryland 1990, provides that any Maryland-chartered savings institutions existing on or after July 1, 1992 were required to be placed in receivership. The fact that this mandatory sunset of the State-chartered thrift industry was enacted by the General Assembly

before Congress ever authorized mergers between healthy thrifts and banks insured by the FDIC serves to explain the General Assembly's lack of any interest in addressing such transactions. Before the FDIC Improvements Act, healthy institutions could not merge under federal law, so an enabling Maryland statute would have been ineffectual. Except for a brief window between December 1991 and July 1992, after the enactment of the FDIC Improvements Act but before the effective date of the provision requiring receivership of any remaining State-chartered thrifts, the only thrift institutions available to merge with Maryland banks are exclusively regulated by the federal government or other states, not by Maryland.[5]

In this case, the entity that will result from the proposed merger will not be subject to supervision by the State. In a sense, the Bank is "exiting" the Maryland-chartered regulatory system in favor of federal control. Since there is clear authority under directly applicable federal law permitting the Bank to transform itself into an a New FSB via merger, it seems only reasonable to conclude that the absence of any reference to such a transaction in State law is not a bar to the merger transaction.

## III

### Acquisition of Baltimore Bancorp
### and New FSB By First Fidelity

#### A.    *Limitations On Interstate Acquisitions*

Section 3(d) of the Bank Holding Company Act, 12 U.S.C. §1842(d), known as the "Douglas Amendment," prohibits a bank holding company from acquiring a bank located in another state unless the acquisition is "specifically authorized by the statute laws of the State in which [the target bank] is located, by language to that effect and not merely by implication."

---

[5] The analysis in this opinion does not address the merger of a Maryland-chartered bank with a thrift chartered by another state, rather than a federal savings bank. Different principles governing conflicts of law apply under those facts, and those differences may require different conclusions than those reached in this opinion.

FI Title 5, Subtitle 10 was enacted under the Douglas Amendment's grant of authority to the states to permit what would otherwise be prohibited interstate bank acquisitions. FI §5-1001(c) adopts the definition of the term "bank" set forth in 12 U.S.C. §1841(c), which expressly excludes federal savings banks. Subtitle 10 therefore imposes no State law obstacle to the acquisition of New FSB by First Fidelity, even though First Fidelity is not located within Subtitle 10's defined geographic region and would not be permitted to acquire a bank in Maryland.[6]

There is, however, an earlier Maryland statute enacted to facilitate a certain type of interstate bank acquisition. Set forth in FI Title 5, Subtitle 9, these provisions impose no geographic limitation on holding companies wanting to acquire Maryland banks. This subtitle does, however, impose significant burdens on the acquiring company, including the requirement that it conduct its business "in a manner and at a location that is not likely to attract customers from this State to the substantial detriment of [existing financial institutions].[7] FI §5-903(a) states that "[e]xcept as expressly provided in §1842 of Title 12 of the United States Code, as

---

[6] In 1987 the General Assembly enacted FI Title 9, Subtitle 10, establishing a regional reciprocal interstate acquisition scheme for savings and loan associations, defined in FI §9-1001(g)(i)(2) to include federal savings banks. The region specified in the savings and loan acquisition bill, like its banking counterpart, does not include New Jersey. We have concluded, however, that the savings and loan acquisition law does not apply to this transaction. In order to be subject to that law, First Fidelity would need to meet the definition of "out-of-state savings and loan holding company." That definition requires control of one or more savings and loan subsidiaries. First Fidelity will not control a savings institution until after the proposed transaction is consummated. More importantly, the provisions of Title 9 that related to the Division of Savings and Loan Associations and the regulation of savings and loan associations "are of no effect and may not be enforced after July 1, 1992." FI §9-908.

[7] FI §5-903 also requires the acquired bank to be limited to one office in the State open to the public to conduct banking business, have at least $10,000,000 in capital on the date of acquisition and $25,000,000 within one year, and employ at least 100 people within one year of acquisition. Subtitle 9 was enacted in 1983, two years before Subtitle 10, specifically to allow Citicorp, a bank holding company located in New York, to establish a "credit card bank" in Hagerstown. No other bank holding company has acquired a bank in Maryland under Subtitle 9.

amended, and as provided herein or otherwise under this article, an out-of-state bank holding company or its subsidiary may not acquire or hold, directly or indirectly, any voting shares of, any interest in, or all or substantially all of the assets of any bank located in this State."

The definition of the term "bank" in FI §5-901(1) specifically includes "a federal savings bank created under applicable provisions of federal law after July 1, 1983." New FSB will be created after July 1, 1983. Accordingly, if Subtitle 9 may constitutionally be applied to the proposed transaction, the transaction would be prohibited unless First Fidelity complies with all of the onerous terms and conditions for an acquisition under that subtitle.

An additional barrier is created by FI §12-207, which provides that, except as permitted under Subtitles 9 and 10, a foreign banking corporation may not have any office in Maryland to conduct, among others, the business of savings banking.[8] Because First Fidelity is a foreign banking corporation and because the acquisition of Baltimore Bancorp will not be accomplished under either Subtitle 9 or Subtitle 10, if FI §12-207 may constitutionally be applied to the proposed transaction, the transaction would be prohibited.

We conclude, however, that neither FI §5-903 nor FI §12-207 may constitutionally be applied to prohibit the proposed acquisition. Our conclusion follows from various decisions of the Supreme Court, including *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27 (1980), as well as prior Opinions of the Attorney General issued in similar circumstances.

---

[8] Section 12-207(b) provides as follows:

> Except as permitted under Title 5, Subtitles 9 and 10 of this article, a foreign banking corporation may not have any office or electronic terminal in this State:
>
> (1) To solicit deposits; or
> (2) To conduct:
>    (i) A general banking business;
>    (ii) A savings banking business; or
>    (iii) A banking and trust business.

### B.    *Scope of the Douglas Amendment*

In *BT Investment*, the Supreme Court held unconstitutional a Florida statute that prohibited out-of-state banks, trust companies, and bank holding companies from owning an investment advisory business in Florida.  Florida argued that the Douglas Amendment justified its attempt to restrict the in-state activities of out-of-state bank holding companies and, therefore, the Court should not subject the law to Commerce Clause scrutiny.

The Court rejected that argument, noting that the only authority granted to the states under the Douglas Amendment was "to *permit* expansion of banking across state lines where it would otherwise be federally prohibited."  447 U.S. at 47.  Even more important for purposes of this opinion, the Court concluded that "the structure of the [Bank Holding Company] Act reveals that §3(d) [the Douglas Amendment] applies only to holding company acquisitions of banks. Non-banking activities are regulated separately in §4, which does not contain a parallel provision." *Id*.  The Douglas Amendment applies only to bank acquisitions, and state laws that purport to restrict the acquisition of other types of financial institutions or financial service corporations are subject to full scrutiny under the Commerce Clause.[9]

Attorney General Sachs considered the scope of the Douglas Amendment when he reviewed earlier interstate acquisitions in 68 *Opinions of the Attorney General* 75 (1983) and 69 *Opinions of the Attorney General* 37 (1984).  The 1983 opinion, dealing with the acquisition of First Maryland Bancorp by Allied Irish Banks Ltd., was issued before FI Subtitles 9 and 10 were enacted.  The 1984 opinion, dealing with the acquisition of Maryland State Bank by Wilmington Trust Company, was issued after the enactment of Subtitle 9 but before the enactment of Subtitle 10.  Each opinion

---

[9] There is an analogous restriction in §10(e)(3) of the Home Owners' Loan Act, the savings institutions' equivalent to the Bank Holding Company Act of 1956, but that restriction (requiring state statutory approval in the manner of the Douglas Amendment) applies only to interstate acquisitions that result in control of savings associations in more than one state.  Because First Fidelity currently has no savings bank subsidiaries and will have only one after the consummation of the proposed transaction, this restriction on interstate acquisitions does not apply to First Fidelity.

reviewed the constitutional permissibility of applying FI §12-204, which then contained a flat prohibition against any foreign bank or affiliate acquiring a bank in Maryland.

In both opinions, the crucial issue was whether or not the Douglas Amendment applied to the transaction. Because Maryland had no permissive legislation at that time that would relax the Douglas Amendment prohibition, application of the Douglas Amendment would have made each transaction impossible, without any Commerce Clause issue at all. In each case, however, the Attorney General found that the Douglas Amendment did *not* apply, and therefore the State prohibition was subject to Commerce Clause analysis.[10]

The conclusions set forth in these Opinions of the Attorney General are bolstered by the subsequent case of *Northeast Bancorp, Inc. v. Board of Governors*, 472 U.S. 159 (1985). This case is complementary to *BT Investment Managers* in that it upheld certain state laws that, unlike the Florida law in *BT Investment*, had been enacted under the protection of the Douglas Amendment. *Northeast Bancorp* rejected a constitutional challenge to regional reciprocal interstate banking laws similar to FI Title 5, Subtitle 10. The complaint was two-fold: first, that the regional reciprocal statutes enacted by Connecticut and Massachusetts were not the type of state law authorized by the Douglas Amendment, because they did not permit bank holding companies from all states to acquire banks in those states; and second, that the regional reciprocal statutes violated

---

[10] The Allied Irish opinion concluded that the Douglas Amendment did not apply, because Allied Irish designated Maryland as its "home state" under the International Banking Act, 12 U.S.C. §611 *et seq.,* prior to making the acquisition, thereby becoming a Maryland bank. The prohibition of the Douglas Amendment was avoided in the Wilmington Trust transaction by having the target bank divest itself of its commercial loan portfolio prior to the acquisition, thus turning itself into a "nonbank bank" under §2(c) of the Bank Holding Company Act. 12 U.S.C. §1841(c) at that time defined a "bank" as "any institution ... which (1) accepts [demand] deposits ... and (2) engages in the business of making commercial loans." Former commercial banks that stopped making commercial loans and divested themselves of their existing commercial loan portfolios could become "nonbank banks," no longer subject to the Bank Holding Company Act or, in certain cases, to state law restrictions on interstate acquisitions. That loophole has since been closed.

the Commerce Clause by discriminating against bank holding companies located outside New England.

The Court first refused to read into the Douglas Amendment an "all or nothing" requirement that would invalidate a regional relaxation of the federal ban on interstate bank acquisitions. As to the Commerce Clause argument, the Court found that the Douglas Amendment could insulate from constitutional attack certain state laws that would otherwise violate the Commerce Clause:

> Congress has authorized by the [Douglas] Amendment the Massachusetts and Connecticut statutes which petitioners challenge as violative of the Commerce Clause. When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause.

472 U.S. at 174. Because the regional reciprocal bank acquisition laws were "plainly authorized" by the Douglas Amendment, they were not subjected to the benefits and burdens analysis that would otherwise be prompted by a challenge under the Commerce Clause. *See* Part IIIC below.

Under *BT Investment Managers* and *Northeast Bancorp*, therefore, the first issue to be resolved is whether the provisions in question are within the scope of the Douglas Amendment. If so, the provisions are protected against attack under the Commerce Clause even if they do discriminate against some forms of interstate commerce. If not, the Commerce Clause applies.

The proposed transaction at issue here is the acquisition of a Maryland federal savings bank by an out-of-state bank holding company. The Douglas Amendment authorizes only state laws permitting the acquisition of banks, which are defined for purposes of the Bank Holding Company Act to exclude federal savings banks. Maryland's primary Douglas Amendment statute is FI Title 5, Subtitle 10, which follows the definition of "bank" contained in the federal act. *See* FI §5-1001(c)(1). FI §§12-207 and 5-903 are not restricted in their effect to "banks." To the extent, therefore, that those provisions purport to reach institutions other than banks, such as federal savings banks, they do not have the protection of the

Douglas Amendment against constitutional challenge under the Commerce Clause.

### C. *Commerce Clause Analysis*

Under the Commerce Clause test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), a state statute that "regulates evenhandedly to effectuate a legitimate local public interest," with "only incidental" effects on interstate commerce, "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142.

The Florida prohibition failed this test, the Court wrote in *BT Investment*, "for we are convinced that the disparate treatment of out-of-state bank holding companies cannot be justified as an incidental burden necessitated by legitimate local concerns." 447 U.S. at 42. The "local concerns" identified and rejected as justification for the burden placed on out-of-state bank holding companies were Florida's interests in discouraging undue economic concentration, regulating financial practices to protect local citizens from fraud, and maximizing local control over financial activities. 447 U.S. at 43.

Applying *BT Investment* and *Bruce Church* to the provision that would have prohibited the Allied Irish transaction, Attorney General Sachs concluded that FI §12-204 violated the Commerce Clause:

> As was true of the Florida statute in *BT Investment*, it is beyond dispute that FI §12-204 imposes at least "an incidental burden" on commerce: it absolutely prohibits an out-of-state bank from becoming a bank holding company. Aside from the local concerns formulated — and specifically rejected — in *BT Investment*, we are at a loss to identify any sufficient local concern in the Allied Irish transaction that, constitutionally, can justify its prohibition.

68 *Opinions of the Attorney General* at 81. The "local concerns" were further diminished by the fact that the bank to be acquired was a national bank, "free from regulatory supervision by the State Bank Commissioner." *Id*.

In the Wilmington Trust opinion, Attorney General Sachs pointed out that, "[a]bsent applicability of [the Douglas Amendment], Maryland law may only prohibit the proposed transaction if it can survive a traditional Commerce Clause analysis." 69 *Opinions of the Attorney General* at 45-46. Again citing *BT Investment* and his own earlier opinion in the Allied Irish case, Attorney General Sachs concluded that "under the Commerce Clause, Maryland law may not absolutely prohibit an interstate bank holding company acquisition that, as here, falls outside the purview of the Bank Holding Company Act." 69 *Opinions of the Attorney General* at 49.

We reach the same result about any attempted application of FI §12-207 or §5-903 to prevent the acquisition of Baltimore Bancorp by First Fidelity. FI §12-207, which prohibits all out-of-state bank holding companies from having "any office ... in this State" to conduct a banking business unless the office is acquired under Subtitle 9 or Subtitle 10, imposes more than an "incidental burden" on interstate commerce under these circumstances. As discussed above, First Fidelity's location in New Jersey makes the use of Subtitle 10 impossible in this case. Although the transaction could technically be structured as an acquisition of a federal savings bank under FI §5-903, Subtitle 9 imposes significant burdens of its own. While these restrictions are in accord with the special purpose for which Subtitle 9 was enacted, they impose an insurmountable barrier to the acquisition and operation of an ordinary commercial bank or savings bank.[11]

Against the clear burdens on interstate commerce imposed by FI §12-207 and Subtitle 9, Maryland would have to assert extraordinarily powerful local interests in order for the State laws to survive the Commerce Clause balancing test of *BT Investment Managers* and *Pike v. Bruce Church, Inc.* No such interests exist. The Court in *BT Investment Managers* dismissed an array of plausible state interests, such as local control of financial businesses

---

[11] *See* note 7 above and accompanying text.

and a desire to discourage undue economic concentration. Furthermore, as the Attorney General pointed out in the Allied Irish opinion, Maryland concerns are muted when the resulting financial institution will be outside the regulatory jurisdiction of the State Bank Commissioner. 68 *Opinions of the Attorney General* at 81.

## IV

## Conclusion

In summary, it is our opinion that Maryland law does not prohibit the contemplated merger between the Bank of Baltimore and a new federal savings bank, with the latter to be the surviving entity. We further conclude that the Commerce Clause does not allow the subsequent acquisition of Baltimore Bancorp by First Fidelity to be impeded by FI §12-207 or the requirements of FI Title 5, Subtitle 9.

> J. Joseph Curran, Jr.
> *Attorney General*
>
> J. Steven Lovejoy
> *Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*